## MOODY *vs* McCOWN.

[REAL ACTION IN NATURE OF EJECTMENT.]

1. *Admissibility of parol evidence to vary writing.*—Where a written agree-ment is entered into between three of a decedent's children and two of his sons-in-law, respecting the division and disposition of his lands and slaves, which purports on its face to allot to the sons-in-law, in their own right, certain portions of the property, parol evidence can-not be received, at law, to show that their portions were intended and understood to be allotted to them in right of their wives, or for the use of their wives.

2. *Objection to illegal evidence.*—When parol evidence is improperly ad-mitted by the primary court, to vary or contradict a written instru-ment, the failure to object to it is not a waiver of its illegality, and does not require or authorize the appellate court to consider it in con-struing the writing.

3. *Construction and effect of agreement respecting disposition of decedent's estate.*—An agreement in writing, executed by and between three of a decedent's children and two of his sons-in-law, which recites that another son-in-law is dissatisfied with the provision made for him in the decedent's will, and proposes to take a specified sum for his interest in the estate; authorizes the administrator to pay him that sum out of the assets of the estate, "on his executing to the undersigned an assignment of all his interest;" then recites that, "in the event of the contemplated settlement, the undersigned will own all the real estate of which said J. J. [decedent] died seized and possessed, and, as they cannot divide it into five parts advantageously, they agree to dispose of a part of it as follows: that M. W. J. *shall take*" a certain tract which is described, at a specified price, and that two of the other parties should each take a designated

tract at a specified price; and then provides that the estimated price of the land, or "proceeds," shall be so distributed among the five parties as to equalize their respective portions,—is an agreement for the sale, and not for the division or partition of the lands, and, not being under seal, does not convey the legal title; but, coupled with possession, and payment of the stipulated price, conveys a complete equitable title, which will support a bill for specific performance.

4. *Presumption of injury from error.*— An erroneous charge in favor of the plaintiff, which authorizes the jury to find a larger verdict for him than he is entitled to recover, will work a reversal at the instance of the defendant, although the evidence shows that the plaintiff was entitled to recover a smaller amount, and the defendant failed to ask an explanatory charge.

APPEAL from the Circuit Court of Tuskaloosa.
Tried before the Hon. WM. S. MUDD.

THIS action was brought by Mrs. Nancy A. McCown, against Washington Moody; was commenced on the 12th January, 1860, and sought to recover a tract of land, which was thus described in the complaint : "the east half of the south-east quarter of section thirty-four, in township twenty-one, range eleven, west; and the west half of the north-west quarter of section two, in township twenty-two, range eleven, west; and the north-east quarter of section three in the same township and range last above named, esti-mated to contain three hundred and twenty acres." The defendant pleaded not guilty, and the statute of limitations of ten years; and issue was joined on those pleas, "in short by consent." The lands in controversy once belonged to James Jenkins, who was the plaintiff's father, and who died in Tuskaloosa county, in the year 1834 ; and were purchased by the defendant, on the 3d February, 1840, at sheriff's sale under execution against Alexander McCown, who was the plaintiff's husband. The plaintiff claimed the land under an alleged division of the real estate belonging to said James Jenkins, among the several heirs-at-law who were interested therein ; and to prove her title, offered in evidence the alleged agreement, of which the following is a copy :

"Whereas Blake B. Jones, being dissatisfied with the provision in his favor made by the last will and testament of James Jenkins, late of Tuskaloosa county, Alabama,

deceased, has proposed to take for his interest in the estate of said decedent the sum of one thousand dollars; therefore, the undersigned, heirs and devisees of the said decedent, do hereby consent that, for the purpose of effecting such compromise, the administrator shall give the said sum of one thousand dollars, out of the estate, upon the said Blake B. Jones executing to the undersigned an assignment of all his interest in right of his wife, Elizabeth D., (late Elizabeth Jenkins,) in and to said estate. And whereas the portions of personal property falling to us under the will *being* unequal in value, owing in part to the death of two negro boys, named Henry and Adam, (children of Esther,) of the portion of Martha W. Jenkins, and to the death of Elsey, a woman, and her child, (named Rhoda,) of the portion of Alexander McCown in right of his wife, Nancy A. M., (late Nancy A. M. Jenkins,) of which they never had possession; therefore, for the purpose of effecting an equalization of some of said portions, and of preventing the trouble of collecting the negroes together for an appraisement, (the same having been distributed according to the will, before the granting of letters of administration,) we agree that our portions of the negroes of the estate then living were, on the 1st day of January last, of the description and value following." (The names and values of the negroes belonging to the several parties are then set out in the agreement, showing that "John M. Jenkins' negroes amount to $2,192"; "Martha W. Jenkins' negroes amount to $2,412"; "Eliza Jenkins' negroes amount to $2,479"; "John H. Lee's negroes, in right of his wife Agnes M., (late Agnes M. Jenkins,) amount to $2,936"; and "Alexander McCown's negroes, in right of his wife, Nancy A. M., (late Nancy A. M. Jenkins,) amount to $2,386.")

"In the event of the contemplated settlement with Blake B. Jones, the undersigned will own all the real estate of which the said James Jenkins died seized and possessed; and, as they cannot divide it into five parts advantageously, they agree to dispose of a part of it, as follows: that Martha W. Jenkins shall take the south-east quarter of section six, nineteen acres off the north end of the east half of the north-east, and also the west half of the north-east quar-

ter of section seven, in township twenty-one, of range ten, west, containing about two hundred and fifty-nine acres of land, more or less, for the sum of one thousand dollars; that John H. Lee shall take the north-east and north-west quarters of section eight, in township twenty-one, of range ten, west, containing about three hundred and twenty acres of land, more or less, known as the ' Cook place ;' also, that part of the south-east quarter and east half of section five, in the same township and range, which lies south of the middle of the large branch running through said half-quarter, (quantity unknown,) for the sum of fifteen hundred dollars; *that Alexander McCown shall take the east half of the south-east quarter of section thirty-four, in township twenty-one, of range eleven, west, and the west-half of the north-west quarter of section two, and the north-east quarter of section three, in township twenty-two, of range eleven, west, estimated to contain three hundred and twenty acres and twelve-hundredths of an acre, at the sum of fifteen hundred dollars.* The aggregate amount of the three last-mentioned sums for the land would be four thousand dollars, and would be coming to the undersigned in equal portions, but for the inequality in value of their portions of the personal property. For the purpose, therefore, of making the portions of Martha W. Jenkins, John H. Lee, and Alexander McCown equal, it is agreed that, of the three-fifths of the proceeds of the land, Martha W. Jenkins shall first receive the sum of five hundred and twenty-four dollars, Alexander McCown shall receive the sum of five hundred and fifty dollars, and the residue of said three-fifths of said proceeds shall be equally divided between the said Martha W. Jenkins, John H. Lee, and Alexander McCown. The remaining two-fifths of said proceeds will be divided between John M. Jenkins and Elias Jenkins. It is also agreed, that this instrument shall be recorded in the orphans' court of Tuskaloosa county. Given under our hands, this 26th day of February, 1835."

(Signed by John M. Jenkins, Alexander McCown, Martha W. Jenkins, John H. Lee, and E. Jenkins.)

The plaintiff also read in evidence, without objection,

the depositions of said John H. Lee and Mrs. Martha W. Hair (formerly Jenkins). Mrs. Hair testified, "that after the death of said James Jenkins, the lands mentioned in said exhibit" [the agreement above copied] "were divided between John H. Lee, witness, and Nancy McCown;" that "the lands set apart to Nancy McCown are the lands described in said exhibit as divided or allotted to Alexander McCown;" that "each of said parties, to-wit, witness, John H. Lee, and Nancy McCown, took immediate possession of the lands allotted or divided to them;" that "said lands were divided by parol, and said instrument was afterwards made, as a kind of memorandum of what had been done;" that all the parties were of full age at the time, "and were ignorant of the law, and of the effect that the insertion of Alexander's name in said instrument instead of Nancy's might have;" that "said lands, mentioned in said instrument as set apart to Alexander McCown, were set apart by the heirs of James Jenkins to said Nancy, and not to said Alexander, and were always recognized and spoken of, both by said Alexander and the family, as Nancy's land, and not as Alexander's." John H. Lee testified, also, that the agreement between the parties was consummated some time before the execution of the written instrument; that "the property left by James Jenkins was disposed of strictly according to said written instrument;" that "Alexander McCown took the portion allotted to his wife on the division, by virtue of being her husband, and acquired a right to said land in no other way." The plaintiff also proved the value of the rents of the lands, and the death of said Alexander McCown in October, 1855.

The defendant read in evidence the sheriff's deed for the lands, and the judgment on which the execution was issued; and proved his possession under claim of ownership from the time of his purchase. He also read in evidence a deed from Blake B. Jones and Elizabeth, his wife, dated the 1st May, 1835, by which they conveyed all their interest in the estate of said James Jenkins, to John M. Jenkins, Martha W. Jenkins, Elias Jenkins, John H. Lee and Agnes, his wife, and Alexander McCown and Nancy, his wife; "that is to say, to the said John M. Jenkins one-fifth part thereof;

to the said Martha W. Jenkins one-fifth part thereof; to the said Elias Jenkins one-fifth part thereof; to the said John H. Lee and Agnes M. Lee, his wife, one-fifth part thereof; and to the said Alexander McCown and Nancy A. M. McCown, his wife, one-fifth parth thereof; and to their heirs and assigns, in the same proportion, forever." "It appeared in evidence, also, that James Jenkins died intestate as to his real estate; and there did not appear to be any restrictions, as the personal property, upon the marital rights of the husbands of his daughters."

The foregoing being all the material evidence in the cause, the court charged the jury, as to the effect of the agreement copied in connection with Mrs. Hair's deposition, that the said agreement did not convey the title to the lands mentioned therein; that it was not an agreement for the sale of said lands, nor did it show a sale of any part of said lands to Alexander McCown; that it was an agreement for a partition or division of said lands therein mentioned, in the event that a contemplated arrangement, specified in said agreement, was effected with Blake B. Jones; that whatever interest or estate, if any, was acquired by Alexander McCown under said agreement, was acquired by him in right of his wife; and if they should believe, from the evidence, that the said Alexander went into possession of the lands sued for, in right of his wife, and retained the possession of the said lands in the same right, until they were sold by the sheriff, and purchased by the defendant, that then the defendant acquired by his said purchase no other estate or interest in said lands than that possessed by the said Alexander McCown, which was an estate only for the life of the said Alexander.

" 2. The court charged the jury, also, that if they should find a verdict for the plaintiff, for any portion of the lands sued for, the plaintiff would be entitled to recover reasonable rent for such portion; but that the jury should not allow rent for more than one year before the commencement of the suit.

" 3. The court charged the jury, also, that under the deed executed by Blake B. Jones and wife, on the 1st day of May, 1835, the said Alexander McCown acquired an interest

in said lands, in his own right, of one-fifth of one-sixth part; and that the defendant had an estate or interest therein to that extent, which the plaintiff could not recover in this action.

"4. The court charged the jury, also, that the cause of action in this suit did not accrue to the plaintiff, until the death of said Alexander McCown, her husband; and if they should believe, from the evidence, that her said husband died in October, 1855, then the plaintiff's right to recover in this action was not barred by the statute of limitations."

These several charges to the jury, to each of which an exception was reserved by the defendant, are the only matters now assigned as error.

E. W. PECK, and W. MOODY, for appellant.
GOLDTHWAITE, RICE & SEMPLE, contra.

PHELAN, J.—The question, or rather questions, upon which this case must be decided, relate chiefly to the true construction and legal import of the instrument in writing, signed on the 26th of February, 1835, and which is set out in the record. The question first arises, what is the legal import of this instrument? But, before we come to this question, in view of the whole state of the case, we are called upon to examine and determine a preliminary question, which is, must this instrument be construed by itself, and according to the natural and obvious meaning of its own terms, or must it be taken, as the bill of exceptions reads, "in connection" with the deposition of Mrs. Hair, and other parol testimony in the case?

It is manifest from all the proof, that, after the verbal negotiations and consultations about the disposition and division of the property of James Jenkins among his heirs and distributees, there was a written agreement drawn up, and signed, and put upon record. It is also shown, beyond question, that this is the only instrument of the kind that was ever made, and that this, in fact, is that instrument. But the agreement as contained in the instrument, and the agreement as shown by the parol evidence of Mrs. Hair

and John H. Lee, differ in two very essential particulars. They testify, that the children of James Jenkins consulted together, and made an agreement respecting a division of the real estate. The instrument shows that the agreement in writing was made and signed, not by James Jenkins' children, but by three of his children, namely, James M., Elias, and Martha W. Jenkins, and his two sons-in-law, J. H. Lee and Alex. McCown. Again, the parol evidence goes to show that this agreement among the children was, that the real estate which was allotted to the married daughters, was to go to them, or to their husbands in their right; while in the written instrument no such limitation or qualification is made, but the allotment is to the husbands by name, and without qualification. Under such circumstances, what is the rule of law? From all the authorities I have consulted, (and they are very numerous,) I can come to no other conclusion, than that, under such circumstances, all the previous verbal negotiations and understandings are merged in the written instrument. It must be interpreted by itself, and the door is forever closed against the introduction of parol proof to vary or contradict its terms, unless upon an allegation of fraud or mistake, in the regular way, by bill in chancery to reform or annul it.

In the case of *The Gardiner Manufacturing Company v. Heald,* (5 Greenleaf's R. 381,) the defendant, who was a tenant in common, was sued for part of the value of timber trees cut on the lands held in common. He produced a deed of partition from the other plaintiffs, who were tenants in common, assigning to one Bangs the lot in question; but it was inoperative for want of a seal. He then offered to show a previous verbal partition. The court said: "The parol testimony went to change that which the parties had set forth in writing. By the latter, the land was to be divided, and the timber as a consequence of that division. By the former, the timber was to be divided, and the land to be left undivided." The following observations from the same opinion are so just and appropriate, that I transcribe them: "The rule of law, which gives a preference to written evidence, and excludes parol when it comes in competition, is designed to elicit and establish truth. Where the

law does not require written evidence, a parol agreement may be enforced. But, when agreements are committed to writing, that alone is evidence of what the parties have agreed. And if, through defect of form, or by reason of some positive provision of law, it cannot have the effect intended, it still remains the best evidence of the understanding of the parties. To suffer it to be controverted and changed by 'slippery memory', would be an attempt to illustrate that which is more certain by that which is less so ; which is no less contrary to just principles of reasoning than to law."—See, also, *Mather v. Goddard*, 7 Conn. 304 ; 1 Greenleaf's Ev. §§ 275 *et seq.;* 5 Cowen, 509 ; 1 Stew. 425 ; *Allen v. Smith,* 20 Ala. 485 ; 12 Ala. 252 ; 19 Ala. 563 ; 16 Ala. 720 ; 18 Ala. 105 ; 3 Cow. Phillipps, 1467, 1428.

We feel constrained to hold, therefore, that the written instrument must be construed by itself, and not, as the court below construed it, "in connection with the deposition of Mrs. Hair" and the other parol testimony which tended to vary or contradict it. Such testimony must be rejected when we come to the construction of that instrument, because it is the best evidence of what the agreement was. All previous verbal understandings having been reduced to writing, the written instrument contains within itself the evidence to which alone we can look for the true meaning and intention of those who signed it, or who make it in any way the basis of their claim or right.

[2.] That this parol testimony was not objected to in the court below, or that no motion was made by the defendant to draw from the court an instruction against its being taken into consideration by the jury, will not, as we conceive, vary the case. The rule of law is, that the best evidence the case admits of must be produced. If either party offers to produce secondary evidence of the *contents* of a deed or other writing, and the opposing party does not object, the latter party waives his right, and the court may receive the secondary evidence. But this rule does not apply, where the parol evidence is not merely a secondary or inferior kind of evidence of the same facts, but is an inferior species of evidence, which *conflicts* with, and *seeks to overthrow,* that which is of a higher degree. This is against

law; the silence of the opposing party does not cure its illegality, and the court is bound, *mero motu*, to treat it as having no validity, and to instruct the jury accordingly, if the nature of the case and the rights of the other party so require. There are cases, in which the rule requiring the best evidence may be relaxed; but evidence which is positively illegal, can never be received; and such is the character of parol evidence going to contradict or vary a written instrument. The court has no power to permit a deed or other writing, the foundation of a right or suit, to be annulled or weakened in that way. Even if the parties consented that the parol evidence should be heard, the rule of interpretation would be the same, because the principle is, that parol evidence shall not be received to *alter* or *contradict* a *written instrument*. If a man should declare upon a note made payable to A, and the defendant should introduce a witness who would testify that the note was made to A through mistake, and was intended to be made to B, and the plaintiff made no objection, would this be heard to defeat the action? The court would say, this is a defense for another forum; the case must proceed here by the rules of law; by the face of the note, the title is in A, and he must have judgment.—See 1 Greenleaf, §§ 82, *et seq.;* 3 Cow. Phil. Ev. 1428, 1467; *Jordan v. Fenno,* 8 Eng. (Ark.) 593; *Goddard v. Cutts,* 11 Fair. (Maine,) 440.

[3.] We come now to consider what is the true import and legal force of the written agreement, and the charge of the court in respect to it. The court charged the jury, "that the said agreement did not convey the title to the lands mentioned therein." That is true. Title to land, that is, the *legal title* to land, could only be conveyed at that time by deed, or writing under seal; and this is not a deed, not being under seal. The court further charged, "that it was not an agreement for the sale of said lands, nor did it show a sale of any part of said lands to Alex. McCown." In this we are compelled to differ from the court; for we do not think that it can be rightly interpreted to import anything less than a sale of the lands, and one tract or parcel to Alex. McCown. It was an agreement for a distributive disposition of the slaves, and a part of the real

estate of James Jenkins, between five persons. Three of
these got lands, and two got no lands; but the proceeds of
the value of the lands was so apportioned, or appropriated,
that what the two failed to get in lands, they got in money
or personal property. Under such an agreement, there can
be no question, that those who got lands purchased the in-
terests in the lands of those who got none, and under this
agreement obtained an equitable title to their respective
tracts, which they could enforce, if necessary, by proceed-
ings in equity. The purchase-money was paid, and they
had an equitable title, with possession, making a perfect
equity.

The court goes on to say, "that it was an agreement for
a partition or division of said lands therein mentioned, in
the event that a contemplated arrangement, specified in said
agreement, was effected with Blake Jones." Here the court
says "*partition or division.*" Legally speaking, it was cer-
tainly not a *partition;* for a partition in law, whether made
by deed, or in some cases without, must assign some part
in severalty to each of the parties holding in common.
Cruise's Digest, title 32, ch. 6; Bouvier, *Partition.* Nothing
like this was done in the present case. If by "partition or
division" the court intended to be understood as designa-
ting only one and the same thing, (which we take to be the
case,) then to call this a *partition* was legally inaccurate.
But this is not an agreement for a *partition* or *division* of
the *lands.* It is, on the contrary, an agreement by the par-
ties to do that among themselves which is now done every
day through the courts; an agreement to sell the lands
which could not be *advantageously divided,* with a view to a
division of the proceeds. The words of the instrument
are: "In the event of the contemplated settlement with
Blake Jones, the undersigned will own all the real estate of
which James Jenkins died seized and possessed; and, as
they *cannot divide* it into five parts advantageously, they
agree to *dispose* of a part of it, as follows: that Martha W.
Jenkins shall *take*" a certain tract which is described, "*for
the sum of one thousand dollars;* that John H. Lee shall
take" a certain other tract " for the sum of fifteen hundred
dollars; that Alex. McCown shall take" a certain other tract

"at .h sum of fifteen hundred dollars." To describe an instrument containing such terms as these as "an agreement for a *partition or division* of said lands," cannot be supported as a just legal exposition of the instrument. The *lands* were not in fact to be *divided* among the parties; but, instead of that, and because, as they say, this *could not be advantageously done,* it was agreed, that some should sell or dispo e of, and others should buy or *take* certain tracts, at stipulated prices, and an agreed sum for the whole; and that this sum, or the "proceeds" of such sale, should be divided. In this way, the transaction becomes, not a *partition or division* of the *lands,*" but a *sale* of the lands, and distribution of the "*proceeds*" or purchase-money. The court therefore erred in its interpretation of the instrument in this respect.

The charge of the court proceeds : "That whatever interest or estate, if any, was acquired by said Alexander McCown, under said agreement, was acquired by him in right of his wife." If the conclusion to which we have already arrived, be sound—namely, that the agreement must be construed by itself, and cannot be varied or contradicted by the parol evidence—then this part of the charge is manifestly erroneous. The instrument does not at all purport to be made by Alex. McCown in behalf of his wife, or declare that what he was acquiring was in her right. He is named as one of the parties to the agreement in the beginning, under the words, "the undersigned, heirs and devisees of the said decedent," and it is signed by him in his own name, and without words of addition or qualification, but simply "Alex. McCown." In the body, where it speaks of the land, the words are, that "Alex. McCown shall take." Where it speaks of the distribution of the proceeds of sale, it says, "Alex. McCown shall receive," &c. As the instrument speaks of him, and him alone, he must be construed to have contracted for, and to have acquired the land in his own right. To prove by parol that he did this in behalf, and for the benefit of another, is one of the very cases put in the books to show that such a thing cannot be done. *Jackson v. Foster,* 12 John. R. 488. Even if the money, or personal property, which went to settle or pay for these

lands, was the money or property derived from his wife's father's estate, it would not alter the case. This money or property, as the law then stood, was his by his marital right, and could be lawfully used in the purchase of property in his own right.

The court furthermore charged, that "if the jury should believe, from the evidence, that said Alexander went into possession of the land sued for, in right of his wife, and retained possession of the said land in the same right, until they were sold by the sheriff, and purchased by the defendant, that the defendant by his purchase acquired no other estate or interest in said lands than that possessed by the said Alex. McCown, which was only for the life of the said Alexander." It is quite manifest, that there is no evidence in this case, upon which this charge could be based, or to which the jury could look under such a charge, except the parol testimony which goes to vary and contradict the written instrument. The court, when it undertook to construe the written instrument, was bound, whether moved thereto or not, to have instructed the jury fully upon its nature and construction, as the case presented itself; and to have told them, first, what was the true legal meaning and import of that agreement, and the nature of the right which Alexander McCown and those claiming under or through him derived under it; and, secondly, that the evidence contained in the depositions of Mrs. Hair and Mr. Lee, being parol evidence, could not be heard to vary or contradict the agreement in writing, and was therefore to be rejected to that extent. As the charge of the court was the very opposite of this, we hold it to be erroneous.—See authorities above cited.

[4.] The argument has been urged upon us, that, inasmuch as the plaintiff established a good legal title to a portion of the land, she was clearly entitled to recover in the action; and that if the charge of the court to the jury did not specify and limit the extent to which that recovery should go, it was the duty of the defendant to have protected himself by asking a charge directed to that point; and if he has failed to do so, and he suffers by it, he cannot complain. Such we accept as the general rule upon

the subject. It is further insisted, that even if there be error in those charges of the court, on which we have already commented, they inflicted no injury, and therefore the judgment should not be reversed on account of them. The rule is, that this court will not reverse for an error of law which does no injury. But then, if error of law in the charge is shown, injury will be presumed, unless it clearly appears that it could have done no injury. Upon looking at the whole case, (and the testimony in this is all set out,) we are far from holding the opinion that those charges could do no injury to the defendant, or that, in fact, as shown by the verdict and judgment, actual injury was not done by them. The verdict rendered in favor of the plaintiff was for the entire interest in the land, excepting one-fifth of one-sixth part; when the title exhibited by plaintiff never extended beyond one-sixth part. That verdict could only have been predicated upon the charges which the court gave respecting the meaning and construction of the written instrument, and the nature of Alexander McCown's possession under it; there was nothing else in the case upon which it could have been predicated; and these charges, as we have shown, were erroneous. The record therefore, so far from showing that no injury was done by them, raises the strongest presumption, if not the actual proof, that serious injury was done by them to the rights of the defendant. They evidently misled the jury upon the question of the extent to which plaintiff was entitled to recover. The testimony in the case shows that defendant was in possession, and had been since 1840, when he purchased at sheriff's sale; and as the plaintiff shows no title, except to one-sixth part, there was nothing shown on the part of the plaintiff by which the defendant could be lawfully deprived of that possession as to the remaining five-sixths of the land.

It is not necessary to notice the other assignments of error. For the errors of the court already noticed, the judgment below is reversed, and the cause remanded.